WALLACE *v.* JOHNSON.

4-9281                                              234 S. W. 2d 49

Opinion delivered November 13, 1950.

Rehearing denied December 11, 1950.

*Cecil Grooms,* for appellant.

*H. M. Cooley, Harry Ponder, Jr.,* and *Harry C. Blanton,* for appellee.

GRIFFIN SMITH, Chief Justice. Land carved from 960 acres near Monette, in the Eastern District of Craighead County, was described in an executory contract, and some of it forms the subject-matter of this controversy.

Activities resulting in the Chancery suit had their inception in efforts of Dr. W. E. Yount, equitable owner of the parent tract, to clear his indebtedness and salvage something from this valuable holding. He employed C. M. Boydstun, of Jonesboro, as agent, and H. M. Cooley, of the same city, as lawyer-agent, to deal with the lands. Dr. Yount, a dentist, residing at Cape Girardeau, Mo., found personal supervision of the property to be impracticable.

In December, 1929, Dr. Yount agreed to sell W. B. Wallace and Everett Wallace two tracts, one containing 80 acres and the other 20. There is evidence that the described area actually contained 101 acres, 43 of which were cleared and contained a house and barn. Dr. Yount, realizing the difficulty he would have in removing legal encumbrances from the land, accepted a down payment of $100 and consented that the next payment ($1,775, representing a fourth of the balance on the basis of $75 per acre) should be made when he could show a merchantable title. The method provided for payment of the remaining three-fourths (less the $100 that went with the contract) is not important here; nor are we concerned with sales contracts made in 1929 by Dr. Yount with other parties, and with his later contracts.

There is testimony that the land is quite valuable now —worth, perhaps, $150 per acre. Some witnesses thought that $30 per acre would represent actual values in 1929, and that the contract price of $75 was extremely high.

Due to depressed conditions following 1929, W. B. and Everett Wallace were willing to negotiate with Dr. Yount on a basis differing from the written contract, although it is possible that they could have stood on the strict letter of their agreement that the second payment was not due until an abstract had been supplied and that title to the property be merchantable.

They elected, however, to accept Dr. Yount's suggestion, made through the agent Boydstun, that for 1930 and 1931 a fourth of the cotton and a third of other crops would be delivered to Dr. Yount, proceeds to be applied to the payment of taxes and insurance. If, after making these payments, a balance remained, it would be applied on the purchase price.

The Sturdivant Bank of Cape Girardeau held an eleven thousand dollar second mortgage on Dr. Yount's lands, and the Doctor owed considerable interest on this mortgage. C. A. Vandivort was the bank's president. In September, 1931, Yount deeded the entire property to Vandivort, who acted as trustee for the bank. In 1933 Dr. Yount filed voluntary bankruptcy proceedings, and there was an adjudication in 1934. If sums paid by contract purchasers of the Craighead County lands were thought by the buyers to be due them from Dr. Yount, they failed to file claims.

As president of the bank Vandivort designated Boydstun to collect rents.

Appellant claims that Vandivort, while inspecting the properties late in 1931, agreed with W. B. Wallace to accept payments on the basis of a third and fourth, as Dr. Yount had, until it was possible to procure a deed. On the first of January, 1932, Boydstun and W. B. Wallace executed a supplemental contract relating to "about 83 acres of cleared land" wherein Vandivort was mentioned as owner and Wallace as lessee. The arrange-

ment called for payments based on a third and fourth. The contract, signed "C. A. Vandivort, by C. M. Boydstun, agent," bound Wallace to deliver possession of the property at termination of the contract—the crop year of 1932. There was, however, this paragraph: "[W. B. Wallace] has a contract of purchase with W. E. Yount, which has been purchased by C. A. Vandivort, (giving the date) and it is agreed . . . that if said contract . . . remains in . . . force, then all rentals on the lands described in said contract paid under [this supplemental agreement] shall be credited on the indebtedness or amount due thereunder, leaving the balance due as called for in said contract."

Boydstun testified that W. B. Wallace told him in 1930 that he had a contract with Dr. Yount, and if "they" were able to pay for the land, *that* 40-acre tract was to go to Everett Wallace and the remaining 60 acres to A. J. and B. A. Wallace. The only agreement Boydstun had with Vandivort covered renting, farm supervision, and related matters, but in January of 1932 he had no right to bind Vandivort on a contract of sale or to conduct such negotiations. Inferences to be drawn from this testimony are that personal knowledge regarding Dr. Yount's contract of 1929 and Boydstun's information that Vandivort had succeeded Yount as proprietor prompted Boydstun's reference to the old contract when the supplement was executed. Boydstun did not inform Vandivort of the content or send his principal a copy, although on cross-examination such assurance of failure was somewhat weakened. Vandivort testified that he did not know of this provision, hence could not ratify it. Furthermore, Boydstun insisted that he exhibited to all of the tenants his letter of limited authority, and told [Wallace] that the contract [relating, presumptively, to the sale] was absolutely worthless without Vandivort's approval, "and that the burden of getting that was on him."

Through various methods of payment and compromise with creditors Vandivort acquired all outstanding claims to the 960 acres, completing payments in 1935 or 1936. The Sturdivant Bank failed in 1932 and its affairs

were administered by the Missouri Commissioner of Finance who in turn executed a deed to Vandivort personally. In December, 1942, Vandivort and his wife conveyed to their seven children for a recited consideration of $1 and love and affection.

W. B. Wallace died in 1945, survived by his widow, and by the appellant Everett, and five other children. The widow died in 1949 after this litigation was begun.

The original action by Vandivort's grantees was forcible entry and detainer, but with other pleadings it became apparent that the justiciable question would be whether the Wallace group could prevail upon their assertions of equitable rights, hence the cause was properly transferred to Chancery, and of course it was not tried on the initial allegation.

Though not conceded by express words, undisputed proof shows that the only cash payment made by any of the Wallaces was the initial $100, although they contend that crop values in excess of the agreed third and fourth, less taxes, insurance, etc., would on a master's accounting sheet disclose complete liquidation of the purchase price. Abandonment, with citations to specific acts indicating that the Wallaces did not intend to carry out their contract after the depression began late in 1929, and *laches*, were pleaded.

Touching upon the extent of Boydstun's authority, counsel for appellant asked his client: "Did you ever have a conversation with Mr. Vandivort about the land: about Mr. Boydstun's authority?" A. "Yes, sir. [Mr. Vandivort] said he might not get down [to Craighead County] very often, and for us to talk with 'Uncle Charlie'—that's what he called Mr. Boydstun." Q. "And Mr. Boydstun collected all payments made by you and the other tenants in the neighborhood, looked after the land, and discussed the planting of crops with you?" A. "Yes, sir."

Two additional houses and barns were constructed in the 1930's, but Vandivort furnished materials and the Wallaces did the work. Most of the land was cleared

by appellant and his relatives before Vandivort bought for the bank. According to Everett Wallace, he did not ask Vandivort for a deed until 1937, but did repeat the request in 1943. Before the suits were filed appellant had on one occasion used fertilizer on his acreage and Vandivort reimbursed him for a fourth of the cost. On cross-examination appellant admitted that in November, 1932, he accepted a receipt from Boydstun as agent acknowledging on behalf of himself and his father that $132.94 had been paid. The total was evidenced by an adding machine slip penciled, "$36.72 rent." It was then stipulated that all of the receipts were marked "rent." At least one check, issued in 1942, was given appellant by Vandivort to reimburse Wallace for money he had spent in repairing the house in which he lived on the 43-acre tract.

In cross-examining appellant he was asked whether, in September, 1943, he "sold out, 'lock, stock, and barrel', to his brother Pete, [including] tools, team, ungathered crops, etc., and remained away until January, 1946?" In partially affirming the transactions, appellant admitted the sales, but denied that he was off the place all of the time embraced within the dates. An exhibit offered by appellees was the contract of B. A. (Pete) Wallace dated Nov. 1, 1943, covering 101 acres. Wallace signed as tenant and Vandivort for his children. It was renewed for 1945.

Particularly during the depression years it was necessary for appellant and his father to borrow money for crop-making purposes. Funds were advanced by the Bertig Gin Company and others. In July, 1934, Everett, A. J., and B. A. Wallace certified to the U. S. Department of Agriculture, AAA division, that they had rented lands from Boydstun as agent for Vandivort "for a share of the crop," and that each was to furnish his own work stock and equipment "and manage the tract of land which [I] have rented, . . . the landlord to pay for major repairs on the place."

In an undated letter to Henry Wallace, Secretary of Agriculture, the three Wallaces in Craighead County

said: "[We] are cotton producers and rent land from an owner and furnish seed, teams, tools, and labor, and manage the operation of the farm. [We] are *interpreted* (interested?) in the contract as managing share-tenants, and [were] refused rights to execute a cotton-reduction contract with [our] landowner, Mr. C. A. Vandivort. He has executed a reduction contract without allowing me to sign in § 12. [We] hereby ask that payment be held until we can come to some agreement."

There was some testimony directed to the relationship between Boydstun and Vandivort, having for its purpose a showing that the agent's authority was more than that of making rental contracts, collecting crop apportionments, and other acts of superintendency. Boydstun no doubt assisted those who were cultivating the lands in procuring advances on prospective crops, and to this extent prepared waivers in favor of those making the loans. But the waivers were not signed by Boydstun. On the contrary they were sent directly to Vandivort.

In January, 1934, Vandivort, the Wallaces, and others met at Black Oak to discuss appropriate division of government benefits that were being paid to farmers. The understanding was evidenced by a writing dated the 31st of that month, the introductory sentence being, *We, the undersigned landowner and tenant.* A. J. and Everett Wallace signed as tenants, and Vandivort as landlord.

W. I. Doyle, who as tenant participated in the Black Oak discussions, testified that in July, following, Vandivort was present at the AAA meeting heretofore referred to and signed a waiver "for all of us" to get money for crop production. Vandivort had stated at the meeting that he wanted to collect these benefits "to apply on those deeds for crop production loans." On one occasion when the witness Doyle was with Wallace (presumptively Everett) and Boydstun, Wallace mentioned his desire to buy from Vandivort. This was before Everett left the land—probably in the spring or summer of 1942. Wallace asked Boydstun if the land could be bought and Boydstun said he didn't know. Wallace then said he

was in a position to pay $4,000 cash for the forty [or 43] acres, having arranged to borrow that sum.

Doyle denied an assertion by Wallace to the effect that he (the witness) was present at a meeting between Vandivort and Wallace in 1937 or 1943 when Wallace demanded of Vandivort that a deed to the land be executed. Wallace later told Boydstun that he had written Vandivort, and that Vandivort replied that he did not want to sell. A copy of Vandivort's letter to Wallace, dated August 15, 1942, was identified by the writer. In it he said: "I have considered your proposal to buy the forty acres on which you live, [but] think it best that I not sell it."

A. J. (Nate) Wallace, Everett's brother, testified that in 1940 he leased 30 acres of the 100-acre tract, that another brother had 30 acres, "and Everett was living on the other 40." In August, 1947, H. A. Wallace stated in writing that he had not at any time made a claim of ownership to an interest in the 80-acre tract, either on his own behalf or as an heir of W. B. Wallace. There was testimony that Nate Wallace made similar statements.

On December 20, 1944, W. B. Wallace made an independent landlord-and-tenant contract with Vandivort. By indorsement it was extended to cover 1945.

The record shows a letter of July 12, 1945, marked "Plaintiff's Exhibit O." It is written with ink on a penned letterhead, and is addressed to Everett Wallace, and is signed, "C. A. Vandivort." Appellant's contention is that it was in response to an inquiry whether the land was for sale. Vandivort testified that he did not write the letter, that it was not written by any of his children, and that he had never had stationery of that kind. Everett Wallace had testified that he wrote Vandivort in 1945, asking if the place could be bought. He had seen the property advertised in a real estate office, and wondered why "his" property was being sold.

After the case had been fully developed Chancellor Cherry rendered a decree in favor of the Vandivort inter-

ests. Before lapse of the term the Chancellor acted favorably upon a motion by counsel for Wallace that the decree be vacated and retrial allowed because, as it was contended, new evidence had been discovered.

This evidence was a contract of June 19, 1934, between Vandivort, Boydstun, and H. M. Cooley. It recited Vandivort's purchase of the Yount property and disclosed Vandivort's assent to the statement that Boydstun and Cooley had contracted with Dr. Yount to sell the 960 acres under the arrangement referred to, and contracts were accordingly made. It was Vandivort's desire that Boydstun and Cooley should "continue their efforts to a final conclusion of sale of all said lands and assist in refinancing the same," therefore an agency was created. Cooley, as attorney, was to receive a stipulated compensation for the services he had rendered Dr. Yount as attorney, [and for services rendered Yount and Vandivort] "in connection with said lands." The sums so stipulated were to compensate for any services Cooley might render "in connection with handling all matters that may be litigated in the future pertaining to said lands for C. A. Vandivort."

The amounts so stipulated were to be paid from net proceeds "derived from the sale of lands that have been sold and that may be hereafter sold, and it is contemplated that C. M. Boydstun shall serve as real estate agent in making sale of the remainder of said lands yet unsold, . . . and for said additional services of [Cooley and Boydstun] in connection with the remainder of said lands and the handling of all matters pertaining to the sale and the legal work," pay would be as fixed in the contract; and "the amount hereinbefore mentioned shall cover all services by [Boydstun and Cooley] that have been rendered and that may hereafter be rendered until the final completion of the same. It is agreed that all contracts heretofore entered into with the men now on said lands shall be carried out as near as possible between said parties and in the manner as [Vandivort, Boydstun, and Cooley] may deem proper and equitable in connection with said contracts."

Counsel for the appellant thinks wording of this contract, though admittedly unknown to any of the Wallaces at the time of its execution, discloses affirmative acknowledgment by Vandivort of his obligations to appellant and his relatives, therefore rental arrangements with Dr. Yount, and the practice continued by Vandivort when he succeeded to the title, should be regarded as expediencies treated at the time as temporary. But, says appellant, whether Vandivort did or did not intend to perform under the Yount contracts, W. B. and Everett Wallace were on the property when Vandivort took over, and he was charged with constructive knowledge of any claim their possession would support.

Appellees reply that C. A. Vandivort's understanding of these contracts (and there were contracts with third parties signed by Dr. Yount about the time he dealt with the Wallaces and later) was influenced by the rental agreements; that he assumed from the conduct of W. B. and Everett Wallace that when the "bottom fell out of real estate values" they were anxious to remain as tenants, but were wholly incapable of completing purchase payments, and that they were being accommodated by the novation—to which would attach an implication of finality insofar as the obligation to purchase was an element.

In a cross-complaint appellant sought specific performance of the 1929 contract and asked that a master be appointed to state an account. The pleading, in the prayer for affirmative relief, included all of the property mentioned in Dr. Yount's contract, and alleged that in defending and prosecuting the plaintiff was acting for himself and "for the use and benefit of other heirs of W. B. Wallace."

In June, 1947, the defendants moved to dismiss for misjoinder of parties. The motion was overruled by Judge Cherry, but sustained by Chancellor C. M. Buck when the final decree was rendered. It was Judge Buck's view that the joint contract was not divisible, that W. B. Wallace had no intention of carrying out the contract, nor was such intention evidenced by Wallace's other

named sons after his death. But the Chancellor thought that Everett Wallace, in good faith, had undertaken to comply with his obligations. However, his failure to designate other Wallace heirs as plaintiffs or defendants justified the holding of misjoinder or nonjoinder. Rents for 1946, 1947, 1948, and 1949 for which Everett Wallace should account were found to be $2,567.68, but $2,060.24. of this sum had been paid, bonds and cross-bonds having been executed.

Our conclusion is that the Chancellor's finding that W. B. Wallace had abandoned his contract is sustained by a preponderance of the evidence; but we think a like finding should be made as to Everett. This makes it unnecessary to determine whether other Wallace heirs were necessary parties.

Even when the Wallace-Yount contract was made, the equitable grantees had notice that a lien-free title might not be obtainable, so there was inserted in the document a paragraph reading: "In the event [Dr. Yount] is unable to secure a release of said lands from mortgages, then [W. B. and Everett Wallace] agree to pay customary rentals. . . ."

Of course if Vandivort had information from which a reasonable man would have concluded that the original parties were not treating the contract as rescinded, liability would attach to successive owners on the ground that possession puts a purchaser on inquiry. Whatever the facts may have been for the years through 1931, there was conduct thereafter to show that the Wallaces were satisfied with tenancy arrangements. Although the mere act of designating landlord and tenant relationships in dealing with the AAA would not be determinative of the issue, doubtless something more than mere curiosity prompted appellant to claim that he wrote Vandivort in 1945 asking if the land could be bought.

Certainly the joint protest of Everett, A. J., and B. A. Wallace to the Secretary of Agriculture at Washington was their studied complaint. On cross-examination Everett admitted that he wrote the letter. Presumptively it was mailed in 1934, for its use as an exhibit is

followed by transcript references to a photostatic copy of a "Landlord Agreement" of July 23, 1934. Everett, A. J., and B. A. Wallace were among those who subscribed as tenants, with Vandivort as landlord.

Although facts in the case at bar are not like those controlling the decision in *Harris* v. *Lemley,* 131 Ark. 471, 199 S. W. 373, there is in that case a distinct recognition that one may, as a matter of law, be held to have abandoned a contract.

Abandonment and rescission are words quite often used indiscriminately. The general rule seems to be that the fee owner of realty will not be held to have abandoned his rights unless by some recognized process the title has been divested. In this respect the law is not the same as that applicable to homestead or estates on condition, and it is held that the equitable doctrine of *laches* or abandonment applies only to easements or licenses and such special rights and abandonment has no application to vested estates; but the title, though not lost by abandonment, might be barred by estoppel or the statute of limitation. Thompson on Real Property, v. 5, pp. 314-15. While failure of vendor and vendee to perform or offer to perform the contract does not alone operate as a mutual rescission, conduct inconsistent with the original intent may—particularly if it is engaged in for a protracted period—disclose the purpose of one or both of the parties as clearly as though there had been express declarations.

Well-reasoned cases hold that as to lands mere temporary absence or nonuser is not sufficient evidence of abandonment, the term "abandonment" having been discussed by the textwriter as a mode of divestiture of title to property in general. *American Jurisprudence,* v. 1, §§ 1 and 14. In his work on the Law of Real Property, Tiffany says, v. 4, § 962, that surrender by act and operation of law, which is expressly excepted from the Statute of Frauds, is a surrender which the law infers from certain acts by the parties as being inconsistent with the continued existence of [the former status]. In his comments on surrender of estates and interests not neces-

sarily identical with the one here involved, Tiffany says that the right is yielded by operation of law "when the tenant accepts from the reversioner a new lease, to begin immediately, or at any time during the existence of the previous lease, this result being based on the theory that, by such acceptance, the tenant is estopped to deny the validity of such lease, which nevertheless cannot be valid unless the first lease is terminated."

The *Restatement of Contracts,* [v. 2, § 406 (b) (c)] construes the law to be that an agreement to rescind need not be expressed in words. "Mutual assent to abandon a contract, like mutual assent to form one, may be manifested in other ways than by words. Therefore, if either party wrongfully expresses a wish or intention to abandon performance of the contract, and the other party fails to object, there may be sometimes circumstances justifying the inference of assent to a rescission. Sometimes even circumstances of a negative character, such as failure by both parties to take any steps looking toward the enforcement or performance of a contract, may amount to a manifestation of mutual assent to rescind it. . . . The question is not one of words, but of substance. Whether the parties talked of 'rescission', 'release', 'discharge', 'waiver', or 'forgiveness' of the right is immaterial." We are not here concerned with the Restatement's illustration No. 2, p. 771 of vol. 2, where the Statute of Frauds is discussed. In the case at bar there is written evidence of appellant's intentions in dealing with the property.

In circumstances strikingly similar to the case at bar, except that notice of forfeiture had been served, it was held that the purchaser of land under an executory contract who after making the initial payment defaulted had abandoned. Several years after the contract was made the parties entered into an agreement whereby Harms, the purchaser, leased the property from Boynton, the seller. The Supreme Court affirmed a holding by the circuit judge that the lease was obtained without fraud, and that Harms' execution of it and occupancy of the land thereunder constituted a surrender of what-

ever rights he formerly had. *Miner* v. *Boynton,* 89 N. W. 336, 129 Mich. 584. The same appellate court, in affirming *Dundas* v. *Foster,* 274 N. W. 731, 281 Mich. 117, reached a like result in 1937, but there, again, notice of forfeiture had been given.

Cases are cited by the textwriter, *Vendor and Purchaser—Abandonment,* Corpus Juris, v. 66, pp. 730-31, sustaining the summary that conduct from which intent may be clearly inferred is the controlling consideration, and this is a question of fact.

Where the parties made a new contract, containing no reference to the former agreement, the original was held to have been abandoned. *Weaver* v. *Propst,* 28 S. W. 2d 872. The decision was by the Texas Court of Civil Appeals. Likewise, a second sale of property without objection from the equitable grantee was treated in Iowa as a mutual abandonment of the first contract. *Miller* v. *McConnell,* 179 Ia. 377, 157 N. W. 943, [rehearing denied, but opinion modified, 161 N. W. 461].

Applying these principles to the case at bar, appellant must lose. While there is some argument that the contract between Vandivort upon the one hand and Boydstun and Cooley on the other recognized the Yount commitments of 1929 as late as 1934, the explanations by these three parties that other contracts were contemplated and that Vandivort's seeming purpose at all times was to treat the rental or lease contracts as responsive to the wishes of all the Wallaces—these and many other facts and circumstances point clearly to acquiescence in the substituted status, continuing from 1932 to 1945.[1]

Affirmed.

---

[1] Appellant filed a supersedeas bond, but paid $2,060.24, leaving an apparent balance of $507.44, plus the value of 1949 crops ungathered or undisposed of when the cause was submitted. Because uncertain computations must be made, the cause is remanded for the single purpose of determining what amount is still chargeable against appellant and his bondsmen.