REED *v.* SHAW.

4-9581                                    243 S. W. 2d 4

Opinion delivered November 5, 1951.

476

*Y. W. Etheridge,* for appellant.

*Thomas Compere* and *DuVal L. Purkins,* for appellee.

GRIFFIN SMITH, Chief Justice. The record presents an example of fine judicial coöperation in this: The Chancellor, in addition to the formal decree, wrote an informative opinion setting out salient facts, discussing the testimony in detail where substantial conflict occurred, and citing cases thought to be controlling or highly persuasive respecting the conclusions reached.

J. P. Blanks died testate in May, 1942. Marguriete B. Shaw, the testator's niece, of Conway, Ark., took under the will, and the land in question goes to her unless effect is given to the contentions of the Reeds who assert that they have the right in equity to pay certain indebtedness and procure compliance with a contract the Hamburg Bank made with Pleas Reed and his wife February 23, 1940. The two are Negroes quite advanced in years. Henry is their son, but does not claim a present interest. He works the property and in general acts for his parents, and was named as a defendant. The Reeds believe that transactions with the bank culminating in the February contract, when viewed in the light of subsequent conduct, created a mortgagor and mortgagee relationship with possession, hence the right of redemption.

The appeal comes from a decretal order finding that the contract was an option to purchase, and cancelling it as a cloud on the devisee's title. The Chancellor granted Mrs. Shaw an appeal from an allowance of $475 in favor of the Reeds for permanent improvements, but the appeal was not perfected within 90 days. No appeal as to this item was prayed in this court, hence the alleged error is not before us.

Pleas Reed, although 79 years of age, testified with the utmost clarity and there is no indication of mental deficiency of a character impairing the capacity to contract even if the suggestion of senility should be tested as of the time of trial; but it must be remembered that the contract was made in 1940, predicated upon business dealings of earlier dates. In speaking of the foreclosed property Reed said that the south 80 acres were acquired by his wife, Bethel, through paternal inheritance and that the north eighty had belonged to W. H. Maxwell. The tracts were cultivated by the proprietors and two sons of Pleas and Bethel and their son-in-law until financial stringencies compelled a mortgage to Hamburg Bank.

In a letter written Dec. 2, 1949, addressed to Mrs. Shaw's husband, it was asserted by counsel for the defendants that the sale was permitted in reliance on a preceding agreement that if the mortgagors would not

take advantage of the Frazier-Lemke Act, and thereby cause delay, the bank would accord the obligors the right "to pay out the mortgage indebtedness of $6,360". However, by amendment to the answer, it was asserted that the debt was $4,655.73, "as found by the Ashley Chancery Court in its foreclosure decree".

In all things of primary importance the Reeds were represented by competent counsel. When the foreclosure was consummated the Hamburg Bank became the purchaser, subject to a Federal Land Bank mortgage given in 1927. As a witness Pleas Reed testified that when the Hamburg Bank debt was incurred he and Maxwell were partners; but Pleas contended he had paid "his portion" and that Maxwell was the defaulter. Maxwell (Nov. 28, 1939) quitclaimed to Pleas Reed under a deed describing the entire 160 acres. This occurred eight days after entry of the foreclosure decree. At the sale January 6, 1940, the bank's bid of $6,000 was accepted and the commissioner's deed of February 26, 1940, was duly approved and recorded. The bank conveyed to Blanks January 15, 1942, and on April 22 that institution paid its creditors and went into voluntary liquidation. The bank vault appears to have been acquired by Frederick P. Blanks, J. P.'s nephew, who testified in respect of bank records that book entries and incidental papers touching the dealings with Reed were intact.

Frederick Blanks emphatically asserted that in handling certain rental matters, and during the period from 1940 to 1947, he had never heard of the bank's contract with the Reeds, but on the contrary dealt with those who were in physical possession—particularly with Henry Reed who acted for his father—on a rental basis. The first knowledge Blanks had that Reed was asserting proprietary interests came in the form of a letter from Attorney Y. W. Etheridge addressed to Mrs. Shaw July 19, 1947. Etheridge quoted a contractual sentence, "It is agreed that if Pleas Reed and Bethel Reed . . . comply with this contract as specified, then the Hamburg Bank must execute to them a deed on December 1, 1949". The contract, said Etheridge, provided for a payment of

$636 per year from February 23, 1940, "until and including the year 1949". The attorney thought that because the Reeds were in possession when the bank's deed was made, Blanks was charged with notice of any claims possession might sustain, and Mrs. Shaw's rights could not be greater than her uncle's.

In commenting that the Chancellor in effect found that "the defeasance contract was in form and wording a rental contract with option to purchase", appellants' counsel says he "has no quarrel" with that construction; but counsel insists that preponderating evidence shows an intention by the parties that the old debt should be continued, with the result that the contract to purchase for $6,360, though an option in terms, was a mortgage in fact.

Some of the legal principles considered by the Chancellor in determining the nature of the contract between the bank and Reed were mentioned by Judge Hart in *Watts* v. *England,* 168 Ark. 213, 269 S. W. 585. But whatever the original intentions may have been as they affected the Hamburg Bank on the one hand and the Reeds on the other, the evidence does not sustain a finding that essentials of the contract were complied with.

Following preliminary language, the contract is that "the said renters [Reed and his wife] rent [from the bank] the following lands . . . The terms of rent are that the lessees shall pay to the Hamburg Bank $500 March 1, 1940, for rent for 1940, and execute a rent note or notes for $6,360, the total lease price, as hereinafter set out, being the sum of $6,860. And said rent amount shall be payable $636 November 1, 1940, and said sum on said date each year thereafter until and including the year 1949. On December 1, 1949, the Hamburg Bank . . . for the consideration of the rents on [the 160 acres] by Pleas and Bethel Reed . . . and for their faithful services in paying the above amounts promptly at dates of their maturity, . . . [agrees] to give [the Reeds] only the option of purchasing the lands on December 1, 1949", . . . for the following consideration. The obligations thus assumed were that there should be

repayment, with 8% interest, of taxes *"for each year for the past ten years"* paid by the Hamburg Bank, payment of any other loans made to the Reeds by the bank, and full discharge of any personal obligations due to either J. P. or F. P. Blanks.

Authority to sublease or subrent without written consent was expressly withheld for 1940 "until after the $500 payment . . ." [to be made March 1] had been made, but should the payment be made before March 1 the right was given Reed to rent for 1940. As to future years the privilege of subleasing for more than a year had to be with the bank's written consent. Title in the bank was expressly retained until all payments had been made, but taxes were to be paid by the bank "as heretofore expressed" and charged to the Reeds. Subsistence of the Federal Land Bank's first mortgage was recognized in a paragraph providing that if the Reeds should fail to meet the installments (referred to as annual, but in fact due semi-annually), the contract would be void; but the bank, by direct language, disclaimed an intent to in any way become responsible for the debt, for ". . . [the Reeds] are to pay same in addition to the amounts specified herein . . ."

We concur in the Chancellor's finding that the contract was a ten-year rental agreement with an option to purchase. Appellants contend that they undertook to pay the Federal Land Bank installments, but found that they had already been discharged. They also insist that the initial item of $500 was paid. The testimony is in irreconcilable conflict regarding specific transactions: whether Pleas Reed made certain payments personally to J. P. Blanks, whether they were made by Henry Reed, and whether J. P. or F. P. Blanks received them.

The testimony of Henry Reed is at sharp variance from statements made by his brother, and Pleas does not agree with either of his sons or with other witnesses as to matters of detail. Frederick Blanks was certain he rented the land to Henry for 1940, but it must be remembered that a lapse of ten years would inevitably affect

one's recollection. None of the bank records discloses payment of the initial $500. There was evidence that the Reeds had between them about $225 and that they mortgaged personal property and borrowed $275 to make up the difference. A mortgage for $275 was in fact executed to Barnes Powell, who is not involved in this litigation.

The Reeds testified that the money was delivered in currency and that no receipt was taken because Blanks said it wasn't necessary. Henry Reed's contention was that the 1940 rent was figured on a third and fourth basis, that the bank was offered $636 in payment, but wouldn't accept that much. His father who had subrented to some of the kinsmen formerly mentioned was paid $325. The agreement for a third and fourth was made with Frederick Blanks. Every year, said Henry, they offered the bank or its successors $636, but the sum was refused.

Jasper Reed testified that the 1940 agreement to rent was made with J. P. Blanks, adding: "We offered to pay him cash rent in 1940, but he refused." Jasper was under the impression that after a short crop was made in 1940 "he changed it then to a cash rental basis" for 1941. Henry says his father "came up here to have some understanding with J. P. Blanks as to how to work [the farm]". The witness then went on to say that Blanks agreed to rent the place for $600, "but at the end of the year when the crops had been gathered my Dad went in to pay, and he claims to make some apologies and said that the crop wasn't much. He paid him $643.40". The understanding was that from time to time the difference would be "made up".[1]

A receipt dated Oct. 16, 1942, acknowledges payment of $615 by Pleas, Henry, and Jasper Reed "in full for the Hamburg Bank farm". Payments for 1943 and each year through 1949 were $625. They were marked "payment of rent", or "rental in full", etc.

---

[1] The transcript, p. 121, shows that Henry testified that the payment was $643.40. This is probably a typographical error, since a receipt reads: "Received $463.40 as payment in full of account and interest due for 1941 to date. F. P. Blanks."

F. P. Blanks testified that the rental payment for 1940 was $125.23. Blanks was inferentially corroborated when Carl McCaig, cashier for Hamburg Bank, testified that the old records disclosed deposits of $78.40 Nov. 27, 1940, and $46.83 Dec. 30 of the same year, a total of $125.23 placed to the credit of "Maxwell and Reed farm". When asked whether he found any other entries for that year McCaig said he had not, but qualified the statement with the explanation that he hadn't looked through the records thoroughly, but they were available.

On cross-examination Pleas Reed again emphasized his payment of $500 in March, 1940, but said he did not pay the rental charge of $625 until 1941. As to all payments showing that the bank or its successors received $625 annually, Reed maintained that he offered $636 but Blanks would not accept it. Henry Reed's testimony, as abstracted by appellants, is that *they* talked with their lawyer in 1941 when the $463.40 payment was made [and] Blanks wouldn't accept a tender of $636.

Henry wrote Mrs. Shaw February 14, 1947, that he had learned she owned the Maxwell and Reed place. He asked whether she would sell and wanted to know what the price and terms would be, adding, "Would you please give me a chance to buy?" The letter, in some of its aspects, is similar to one written by Everett Wallace, p. 885 of vol. 217 of the Arkansas Reports, *Wallace v. Johnson*, 234 S. W. 2d 49. In that case Wallace explained that his letter was, in effect, a *feeler* because he had seen the land advertised. Here Henry Reed testified that a white man advised him to make the inquiry.

In arguing that the contract was a mortgage, appellants say there were two antecedent debts: one for $854.73 it is claimed was paid during negotiations, the other for $4,655.73 on which there was foreclosure. Pleas Reed testified that the difference of $1,344.27 between debt and the bank's $6,000 bid was not paid to him or otherwise accounted for. In his opinion the Chancellor found that while the decree recited a judgment for the larger sum ($4,655.73) with costs, actually two items were dealt with. The obligation of $854.26 corresponds with a debt the

Reeds identified, but claimed was paid. On the face of the judgment the $4,655.73 debt drew interest from November 20, 1939; but, said the Chancellor, in the receivership suit filed May 12, 1939, the larger debt is referred to as $4,655.73 with interest from May 23, 1935, to February 8, 1939—$1,745.88. At a hearing June 22, 1939, J. P. Blanks testified that the amount due was the note with interest from May 23, 1935, less a payment of $351.01.

A statement filed by Hamburg Bank in the receivership suit supplied verification. In the foreclosure suit filed September 14, 1938, the prayer was for judgment for $4,655.73 with interest from May 23, 1935. A docket entry made by the Chancellor when the decree was rendered reads: "Judgment for sum sued on, on the pleadings and evidence." In the appeal now before us the Chancellor said: "All the transactions touching the contract took place with that situation prevailing. Both parties were represented by counsel and the question was not raised. Furthermore, in the original answer filed in this case it was stated that the amount for which foreclosure was had was the sum of $854.26 and $4,655.73. Defendants' answer in the foreclosure suit is not with the papers in this case."

There is satisfactory evidence that the property, when foreclosed, was worth $35 to $40 per acre. The cleared land was slightly more than a hundred acres. A defense witness testified that it was highly productive —as good or better than any in the community. F. P. Blanks testified regarding rental value of other lands from which a clear inference would arise that $625 per year for the farm in question would not be excessive.

On the question of credibility it was shown that in 1922 and 1923 P. R. Reed and W. H. Maxwell were indicted for fraudulently issuing school warrants. Reed was president and Maxwell secretary of the board of directors, School District No. 30. Three charges were preferred against each. A certified copy of the criminal records of Ashley county shows that in Circuit Court pleas of guilty were entered. The defendants were given

suspended sentences and probation on condition that the misappropriated fund be repaid.

While we do not take judicial notice of economic conditions in a particular locality, we do know that after 1941, in consequence of World War II and the government's program for increased farm production, agricultural values in general began an upward spiral and have continued in that direction with but slight occasional recessions. In assuming that the Maxwell-Reed farm was not an exception to the general rule—an assumption supported by admissions—we are not engaging in speculation. It is therefore understandable that the Chancellor should look to the foreclosure transaction in the sense that a realist would have viewed it from 1935 through 1940.

Federal Land Bank payments on the first mortgage made during the period in controversy amounted to more than $1,200, none of which was paid by any of the Reeds or on their account. If the debt subsisted as an obligation of Pleas Reed, interest was chargeable on the installments. With the exception of 1947 and 1949 the Bank, Mrs. Shaw, or Blanks paid the taxes.

The Chancellor's finding that the $500 payment was not made is supported by ample evidence. It is not contended that the Land Bank installments were met, and the trial court did not believe testimony regarding payment of rent for 1940.

What appears to have happened is that because of the short crop in 1940 the Reeds abandoned the written contract, and J. P. Blanks so understood it. His death eliminates the possibility of testimony touching specific acts.

If the apportionable annual payments of $636 asserted by appellants had in fact been refused for so long a time, and with recurring regularity, certainly suspicion of misunderstanding would have occurred to the Reeds before 1947; nor does it seem likely, in view of interparty dealings, that with knowledge by Reed that Blanks

declined to issue a receipt for the $500 claimed to have been paid under the contract, there would have been a seven-year delay in clarifying the status now asserted. A strong circumstance is Henry Reed's letter to Mrs. Shaw.

Characteristics of a lease with purchase privileges were discussed in *Smith* v. *Carter*, 213 Ark. 937, 214 S. W. 2d 64. Abandonment of an option was dealt with in the Wallace-Johnson case, *supra*.

Affirmed.